<u>NOT FOR PUBLICATION</u>                                    (Document No. 26)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                              :
YVONNE CORBI and                              :
JOSEPH CORBI,                                 :
                                              :
            Plaintiffs,                        :          Civil No. 08-5875 (RBK/JS)
                                              :
            v.                                 :          **OPINION**
                                              :
HARRAH'S HOTEL & CASINO et al.,               :
                                              :
            Defendants.                        :
_____      :

**KUGLER**, United States District Judge:

       This matter arises out of alleged food poisoning at Harrah's Hotel and Casino

("Harrah's") in Atlantic City, New Jersey.  Presently before the Court is the Motion for Summary

Judgment filed by Defendants Harrah's Associates, Harrah's Atlantic City, Harrah's

Entertainment, Inc., Harrah's Hotel & Casino, Harrah's Operating Company, and Marina

Associates.  Plaintiffs Yvonne and Joseph Corbi argue that they were infected with salmonella by

food they consumed at Harrah's.  Defendants argue that Plaintiffs' claim fails because they

cannot prove that any food item they consumed at Harrah's was the proximate cause of their

illness.  Specifically, Defendants argue that:  (1) Plaintiffs cannot identify any individual food

item that caused their illness; (2) Plaintiffs were poisoned outside of the incubation period for

salmonella; and (3) Plaintiffs cannot eliminate other food products that potentially caused the

1

illness.  For the reasons expressed below, Defendants' motion is denied.

## I.      BACKGROUND

Yvonne Corbi and her husband, Joseph Corbi, traveled to Atlantic City, New Jersey on December 29, 2006 between 3:00 and 4:00 p.m.  Approximately twenty-four hours after arriving at Harrah's, Yvonne became violently ill, and shortly thereafter, Joseph also became ill. Eventually, both Yvonne and Joseph were diagnosed with salmonella entercolitis ("SE").  As a result of the SE, Yvonne suffered a ruptured colon and developed acute peritonitis.  In order to mend the rupture, Yvonne underwent an emergency surgery.  Four months after the emergency surgery, Yvonne underwent yet another surgery to reverse a colostomy and reattach portions of her remaining bowel.  During recovery from the second surgery, Yvonne suffered from an infection and abdominal pain.

The record contains a detailed account of the food items Plaintiffs consumed between 11:00 p.m. on December 27, 2006 and 11:00 a.m. on December 30, 2006.  Yvonne Corbi stated that she ate the following food items during this period:

| Date | Time | Food Item(s) | Location | Source |
|------|------|-------------|----------|--------|
| **Wednesday, December 27, 2006** | 11:00 p.m. | Nothing (retired for the evening) | Home | (Y. Corbi Dep. 36:17-23, Oct. 28, 2009.) |
| **Thursday, December 28, 2006** | AM Breakfast (specific time unavailable) | Coffee (cream and sugar) and soft pretzel | Westbrook Market, Clifton Heights, PA | (Y. Corbi Dep. 26:8-17, Oct. 28, 2009.) |
| | 12:30 p.m. | [may have had] Bowl of Rice Krispies cereal with whole milk | Home | (Y. Corbi Dep. 29:8-30:22, Oct. 28, 2009.) |
| | 5:00 p.m. | Pizza | Scarrinos Pizza in Springfield, PA | (Y. Corbi Dep. 24:2-17, Oct. 28, 2009.) |
| **Friday,** | AM Breakfast | Coffee (cream and sugar) and | Westbrook Market, | (Y. Corbi Dep. |

2

| December 29, 2006 | (specific time unavailable) | soft pretzel | Clifton Heights, PA | 27:8-28:7, Oct. 28, 2009.) |
|---|---|---|---|---|
| | 4:00 - 4:30 p.m. | Reuben sandwich and Coca Cola soft drink | Reflections Café | (Y. Corbi Dep. 31:7-32:11, Oct. 28, 2009.) |
| | 9:00 p.m. | Coffee (cream and sugar), cookie or danish | Reflections Café | (Y. Corbi Dep. 32:22-33:13, Oct. 28, 2009.) |
| Saturday, December 30, 2006 | 7:00 - 8:30 a.m. | Coffee (cream and sugar), orange juice, one-half bagel | Defendant's Club Cappuccino Coffee | (Y. Corbi Dep. 37:10-38:14, Oct. 28, 2009.) |
| | 11:00 a.m. | Coffee (cream and sugar), one egg over medium, one slice bacon (taken from Mr. Corbi's dish) and rye toast with grape jelly | Reflections Café | (Y. Corbi Dep. 39:1-40:16, Oct. 28, 2009.) |
| | 3:00 - 3:30 p.m. | Ginger ale soda, pretzel | Vending machine on hotel room floor | (Y. Corbi Dep. 42:9-13, Oct. 28, 2009.) |

Joseph Corbi stated that he ate the following items during the same period:

| Date | Time | Food Item(s) | Location | Source |
|---|---|---|---|---|
| **Wednesday, December 27, 2006** | 11:00 p.m. | None | N/A | N/A |
| **Thursday, December 28, 2006** | 5:30 a.m. | Coffee, Cherios, raisins with Lactaid milk | Purchased at Acme Supermarket | (J. Corbi Dep. 13:10-14:14, Oct. 29, 2009.) |
| | 11:45 a.m. | Ritz crackers with peanut butter, orange, apple and banana | Purchased at Acme Supermarket | (J. Corbi Dep. 15:4-18, Oct. 29, 2009.) |
| | 5:00 p.m. | Pizza | Scarrinos Pizza in Springfield, PA | (J. Corbi Dep. 15:13-16:22, Oct. 29, 2009.) |
| **Friday, December 29, 2006** | 5:30 a.m. | Coffee, Cherios, raisins with Lactaid Milk | Purchased at Acme Supermarket | (J. Corbi Dep. 17:15-20, Oct. 29, 2009.) |
| | 11:45 a.m. | Ritz crackers with peanut butter, an orange, apple and banana | Purchased at Acme Supermarket | (J. Corbi Dep. 17:15-18:7, Oct. 29, 2009.) |

3

|  | 4:00 - 4:30 p.m. | Tuna sandwich, glass of Tanqueray gin on the rocks w/olive, water | Reflections Café | (J. Corbi Dep. 19:5-21:3, Oct. 29, 2009.) |
|---|---|---|---|---|
|  | 9:00 p.m. | Decaffeinated coffee (with cream), cookie and/or danish | Defendants' Club Cappuccino Shop | (J. Corbi Dep. 21:6-22:3, Oct. 29, 2009.) |
| **Saturday, December 30, 2006** | 7:00 - 8:30 a.m. | Coffee and one-half bagel | Defendants' Club Cappuccino Coffee Shop | (J. Corbi Dep. 24:3-15, Oct. 29, 2009.) |
|  | 11:00 a.m. | Two eggs over medium w/ black pepper, potatoes, white toast, bacon well-done, coffee and water | Reflection's Café | (J. Corbi Dep. 24:11-25:10, Oct. 29, 2009.) |
|  | 3:00 - 3:30 p.m. | None (began to feel ill between 2:00 and 3:30 p.m.) | Atlantic City | (J. Corbi Dep. 10:3-11:22, Oct. 29, 2009.) |

Thus, Plaintiffs ate the following common food items during the sixty-five hour period preceding their symptoms. On Thursday, December 28, 2006 at approximately 5:00 p.m., Plaintiffs consumed pizza from Scarrinos Pizza in Springfield, Pennsylvania. On Friday, December 29, 2006 at 9:00 p.m., Plaintiffs consumed coffee, cream, cookies and/or a danish at Harrah's. On Saturday, December 30, 2006, between approximately 7:00 and 8:30 a.m. Plaintiffs' consumed coffee and a bagel with cream cheese at Harrah's, and at 11:00 a.m. Plaintiffs' ate eggs over medium, bacon, and coffee at Reflections Café.

Although the precise cause of Plaintiffs' SE infection is unknown, both parties provided expert reports concerning the likely cause of their SE. Plaintiffs' experts concluded that the most likely cause of SE was the food Plaintiffs consumed at Harrah's, and ruled out the possibility that the cause of poisoning was the pizza Plaintiffs consumed on December 28, 2006. Plaintiffs first expert, Dr. Jennifer Aldrich, an infectious disease specialist, concluded that "[Plaintiffs'] infection with Salmonella occurred as a result of consuming contaminated food purchased at Harrah's."

(Pl.'s Response to the Mot. of Def. for Summ. J. Ex. A, at 2.)  To reach this conclusion, Dr.

Aldrich examined the foods that Plaintiffs consumed prior to the onset of their symptoms and

determined that "[t]he time from [when Plaintiffs] ingest[ed] [the eggs] to the time of [Plaintiffs']

symptoms falls within the documented incubation periods in other Salmonella reports."  (Id.)  Dr.

Aldrich also eliminated the possibility that the cause of Plaintiffs' illness was pizza.  Specifically,

Dr. Aldrich stated that "[t]he only food that [Plaintiffs] shared in common prior to arrival at

Harrah's had been a pizza, . . . [however] [,] [p]izza would be an unlikely source of Salmonella

infection, as the cheese would be well-cooked, killing the organism."  (Id.)

Plaintiffs' next expert, Dr. Jerrold Ellner, an internal medicine and infectious disease

specialist, concluded that "[w]hereas any of the foods that she consumed at Harrah's could

theoretically have been the cause [of Yvonne Corbi's SE infection], . . . the eggs over medium

seem most likely to be culpable" because "[Plaintiffs] consumed the eggs and this is the most

common source of transmission of SE."  (Pl.'s Response to the Mot. of Def. for Summ. J. Ex. B,

at 3.)  To reach this conclusion, Dr. Ellner analyzed Plaintiffs' food intake history – specifically,

the common food items Plaintiffs consumed during the forty-eight hour period leading up to their

symptoms.  Dr. Ellner also made two other notable observations.  First, he noted that "the

incubation period [for SE] may relate to the size of the inoculum," and that "[i]n food-borne

outbreaks, symptoms have started within as few as 3 hours."  (Id. at 2.)  Next, he stated that "[o]ne

can rule out the pizza ingested by [Plaintiffs] as relevant given the long period between eating the

pizza and the symptoms and the fact that pizza has never [been] reported to be a cause of disease

due to Salmonella enteriditis."  (Id.)

Plaintiffs' family physician, Dr. James Harkins, an internal medicine specialist, concluded

that the eggs Plaintiffs consumed at Harrah's were the source of their SE.  Dr. Harkins observed

that "the time-line of Mrs. Corbi's illness (as well as that of her husband) with respect to the

consumption of eggs at Harrah's Hotel and Casino . . . makes a compelling case that the eggs were

the source of the Salmonella."  (Pl.'s Response to the Mot. of Def. for Summ. J. Ex. C., at 3.)  Dr.

Harkins reached this conclusion based on his observation that "infected eggs are the most

common food source of SE."  (Id.)

   Finally, Plaintiffs offered an expert report prepared by Professor Edward Pomianoski, a

professor of hospitality management and National Restaurant Association Certified Food and

Beverage Executive.  Professor Pomianoski concluded that "[Defendants] breached the implied

warranty that the food served was merchantable . . . ."  (Pl.'s Response to Mot. of Def. for Summ.

J. Ex. E, at 9.)  In reaching this conclusion, Professor Pomianoski made the following

observations.  First, he noted that "[t]he foods served to [Plaintiffs] 'were served to them in a

deleterious [harmful] condition,' based on the continuing pattern of food service sanitation

violations within the Reflections Café environment."  (Id.)  Second, he observed that the results of

a number of Atlantic City Health Department inspections revealed that Reflections Café failed to

meet industry safety standards.  Specifically, Professor Pomianski reported that an inspection

conducted on November 27 and 28, 2006, revealed the following deficiencies:  (1) a freezer

temperature of twenty-five degrees Fahrenheit for a system that should be maintained at zero

degrees; (2) breakfast sausage cooked at 134.01 degrees Fahrenheit that should have been [cooked

at] 140 degrees; and (3) "one live roach crawling on [a] transfer [refrigerator] drawer."  (Pl.'s

Response to Mot. of Def. for Summ. J. Ex. E, at 4.)  An inspection conducted on March 5, 2007

revealed the following deficiencies:  (1) "6-12 live roaches . . . nesting . . . in . . . cabinets under

[the] soda bar"; (2) "dozens of fruit flies"; and (3) ". . . grime, [and] dead roaches" on the floor. (Id.)

Defendants' expert witness, Dr. Acheson, an internal medicine and infectious disease specialist, concluded that he could not make a reasonable estimate as to the cause of Plaintiffs' SE.  In reaching this conclusion, Dr. Acheson stated "[t]here is nothing in the records . . . which indicates any recent common exposure to a food that is likely to have high levels of Salmonella enteritidis."  (Def.'s Mot. for Summ. J. Ex. E, at 4.)  Dr. Acheson also made the following observations.  First, he dismissed the possibility that the medium eggs Plaintiffs consumed at Reflections Café caused their SE because "[Plaintiffs] did not share a common source of eggs prior to their illness . . . ."  (Def.'s Mot. for Summ. J. Ex. E, at 4-5.)  Next, he stated that the incubation period for SE is between six hours and ten days, and the usual incubation period for SE is six hours to forty-eight hours.  (Id. at 2.)  Additionally, Dr. Acheson noted that other types of food typically are associated with SE, including peanut butter, ice cream, white pepper, black pepper, veggie booty, tomatoes, melons, hot peppers, poultry, ground beef, sprouts, fish, shrimp, chocolate, dried milk, and puffed rice.  (Id. at 4.)  Finally, Dr. Acheson noted that "[i]n order for . . . [Plaintiffs] to develop symptoms [of SE] within three hours [of exposure] . . . one would have to assume that the dose of Salmonella was large and due to a common exposure."  (Id.)  However, he concluded that "nothing in the records . . . indicates any recent common exposure to a food that is likely to have high levels of Salmonella enteritidis."  (Id.)

## II.    STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material

fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence

presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  Id. at 255.

 The burden of establishing the nonexistence of a "genuine issue" is on the party moving

for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).

The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a

genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that

there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

 Once the moving party satisfies this initial burden, the nonmoving party must "set out

specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the nonmoving

party must "do more than simply show that there is some metaphysical doubt as to the material

facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to

survive summary judgment, the nonmoving party must "make a showing sufficient to establish the

existence of [every] element essential to that party's case, and on which that party will bear the

burden of proof at trial."  Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary

judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts

of record which would contradict the facts identified by the movant.'"  Corliss v. Varner, 247 F.

App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311

F.3d 226, 233 (3d Cir. 2002)).

 In deciding the merits of a party's motion for summary judgment, the court's role is not to

evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the factfinder, not the district court.  BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

The central issue in this dispute is whether Plaintiffs offer evidence from which a reasonable jury could conclude that the food Plaintiffs consumed at Harrah's was the proximate cause of their SE.  Notably, Defendants do not challenge the admissibility of Plaintiffs' expert reports on the grounds that the experts are unqualified or their methods are unreliable.  Rather, Defendants argue that Plaintiffs cannot prove proximate causation because:  (1) they cannot prove that any particular food item they consumed at Harrah's caused SE; (2) Plaintiffs' argument that they were infected by eggs they consumed at Reflections Café fails because Plaintiffs consumed the eggs outside of the incubation period for SE; and (3) Plaintiffs cannot eliminate other plausible sources of SE that were outside of Defendants' control during the disputed period.

Plaintiffs respond by arguing that they were infected by food served at Defendants' establishment because:  (1) four experts concluded that Plaintiffs' SE was caused by food served at establishments owned or operated by Defendants; (2) a three-hour incubation period for SE is plausible because the length of the incubation period decreases when a victim is exposed to a larger quantity of SE; (3) and the unsanitary conditions at Harrah's put Plaintiffs at an increased risk of infection.

### A.     New Jersey Law

Because this dispute arises under New Jersey law, "the task of [this Court] is to predict

how [the New Jersey Supreme Court] would rule . . . ."  Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., 652 F.2d 1165, 1167 (3d Cir. 1981) (citations omitted), overruled on other grounds by Aloe Co. v. Clark Equip. Co., 816 F.2d 110 (3d Cir. 1987).  In food poisoning cases, as in all other tort actions, "New Jersey has a strong policy which favors recovery by innocently injured plaintiffs who cannot otherwise recover because they cannot identify the source of their injuries."  McGuinness v. Wakefern Corp., 608 A.2d 447, 450 (N.J. Super. Ct. Law Div. 1991).

Under New Jersey law, a restaurant is strictly liable for serving adulterated food.  See Koster v. Scotch Assoc., 640 A.2d 1225, 1226 (N.J. Super. Ct. Law Div. 1993).  However, a plaintiff bringing a strict liability action must prove causation.  Cruz-Mendez v. ISU/Ins. Serv. of San Francisco, 722 A.2d 515, 524 (N.J. 1999) (citing Coffman v. Keene Corp., 628 A.2d 710 (N.J. 1993)).  Generally, causation consists of two elements.  First, "a plaintiff must show that the defendant's act or omission was the factual, or "but for," cause of the injury . . . ."  Id.  Second, "even under a strict liability standard, a plaintiff must prove that this factual cause was a proximate cause of the injury."  Id. (citing Prosser & Keeton on Torts § 41 (5th Ed. 1984)).

New Jersey has also adopted an "alternative" theory of liability.  Under this theory, where "there is . . . an injury resulting from a single act of wrongdoing (product liability) committed by one of the defendants with the proof not clear as to which defendant, if any, is guilty of the single act and the inference can be drawn that one of the defendants is responsible, the defendants will be required to present evidence of their non-liability."  McGuinness, 608 A.2d at 450 (emphasis added).  As the Court noted in McGuinness, "[i]t would be exceedingly unjust to deny [a] plaintiff compensation" because the plaintiff cannot identify a guilty defendant, "and the possibility exists that the precise causative agent of the plaintiff[']s injuries is not before the court."  Id. (quoting

Anderson v. Somberg, 338 A.2d 1, 8 (N.J. 1975)) (emphasis added.).  Therefore, in food

poisoning cases, a plaintiff may survive a motion for summary judgment when, based upon the

evidence in the record, a court may draw the inference that one of the defendants (or a defendant

not before the court) is responsible for the allegedly wrongful conduct and each defendant before

the Court fails to prove that he or she is not liable for the plaintiff's injuries.

### B.    Plaintiffs' Evidence of Proximate Causation

Applying these principles to the case at bar, Plaintiffs offer sufficient evidence upon which

a reasonable jury could conclude that the cause of their stomach ailment was a food item they

consumed at Harrah's.  First, Plaintiffs offered expert reports from four experts who concluded

that food Plaintiffs consumed at Harrah's caused their illness.  Although expert medical testimony

is not dispositive on the issue of causation, in New Jersey it is "often . . . used to demonstrate a

causal link between the defendant's allegedly negligent conduct and the plaintiff's injury."

Creanga v. Jardal, 886 A.2d 633, 638 (N.J. 2005).  Dr. Harkins, Plaintiffs' family physician,

opined that "the Salmonella enterocolitis was caused by the eggs consumed at Harrah's Hotel and

Casino."  (Pl.'s Response to the Mot. of Def.'s for Summ. J. Ex. C, at 3.)  Similarly, Dr. Ellner, an

expert in internal medicine and infectious diseases, concluded that "[w]hereas any of the foods

that she consumed at Harrah's could theoretically have been the cause, either directly or through

cross-contamination, the eggs over medium seem most likely to be culpable."  (Pl.'s Response to

the Mot. of Def.'s for Summ. J. Ex. B, at 3.)  Plaintiffs' expert, Dr. Aldrich, also stated that "it is

my expert opinion that with a reasonable degree of medical certainty, Mr. and Mrs. Corbi's

infection with Salmonella occured as a result of consuming contaminated food purchased at

Harrah's."  (Pl.'s Response to the Mot. of Def.'s for Summ. J. Ex. A, at 3.)  Finally, Professor

Pomianoski, concluded that Reflections Café "breached the implied warranty that the food served was merchantable, meaning that they were fit for human consumption," and that "this breach of warranty was a substantial factor in causing the cases of salmonella suffered by Plaintiffs."  (Pl.'s Response to the Mot. of Def.'s for Summ. J. Ex. E, at 9.)  Thus, drawing all reasonable inferences in favor of Plaintiffs, it is clear that a reasonable jury could find this expert testimony persuasive and conclude that the eggs Plaintiffs consumed at Harrah's caused their stomach illness.

Second, because the only item that both Yvonne and Joseph Corbi consumed in the days immediately preceding their arrival at Harrah's symptoms was pizza, and the evidence suggests that pizza is not a cause of SE, a reasonable jury could conclude that the food items Plaintiffs consumed during their stay at Harrah's caused SE.  Both parties' experts stated that the normal incubation period for SE is approximately six to seventy-two hours.[1]  Furthermore, the evidence reveals that during the thirty-nine hours preceding their arrival at Harrah's, the only item that both Yvonne and Joseph Corbi consumed was pizza, and two of Plaintiffs' experts agreed that pizza does not cause SE.[2]  Therefore, a reasonable jury could conclude that the most likely source of their illness was an item they purchased at Harrah's.

Third, the documented conditions at Reflections Café further support a causal connection

---

[1] Dr. Aldrich stated that the "onset of [SE] symptoms from the time of ingestion of contaminated food is often between 12 to 72 hours."  (Pl.'s Response to the Mot. of Def. for Summ. J. Ex. A, at 2.)  Dr. Ellner stated that the normal incubation period for SE is eight to forty-eight hours.  (Id. Ex. B, at 2.)  Dr. Harkins also agreed that the normal incubation period for SE is eight to forty-eight hours.  (Id. Ex. C, at 5.)  Finally, Defendants' expert, Dr. Acheson, stated that the normal incubation period for SE is between six hours and forty-eight hours.  (Def. Mot. for Summ. J. Ex. E, at  2.)

[2] Specifically, Dr. Aldrich stated "[p]izza would be an unlikely source of Salmonella infection, as the cheese would be well-cooked, killing the organism."  (Pl. Response to Mot. of Def. for Summ. J. Ex. A, at 2.)  Dr. Ellner stated that "[o]ne can rule out the pizza ingested by both Corbi's as relevant given the long period between eating the pizza and [Plaintiffs'] symptoms and the fact that pizza has never reported to be a cause of disease due to Salmonella enteriditis."  (Pl. Response to Mot. of Def. for Summ. J. Ex. B, at 3.) (emphasis added).

between the eggs Plaintiffs consumed at Reflections Café and the onset of their SE symptoms. The health inspection reports from both before and after Plaintiffs' stay at Harrah's demonstrate that Reflections Café consistently failed to meet industry standards for safety and cleanliness.  For example, a report from November 28, 2006 noted that the inspector uncovered "grossly unsanitary conditions considered hazardous to public health."  (Pl.'s Response to the Mot. of Def. for Summ. J. Ex. E, at 4.)  A report from the Reflections Café on March 5, 2006 reveals food items stored on the floor, "excessive amounts of grease and old food waste on [a] shelf under [the] grill," and "6-12 live roaches . . . nesting in . . . cabinets under [the] soda bar."  (Pl.'s Response to the Mot. of Def.'s for Summ. J. Ex. E, at 4-6.)  Therefore, taken as a whole, expert testimony, the fact that the only item that Plaintiffs consumed during the sixty-five hour period immediately preceding the onset of their symptoms does not cause SE, and the unsanitary conditions at Reflections Café create a reasonable inference that food Plaintiffs consumed at Harrah's caused their SE.

### C.    Defendants' Arguments

Defendants argument that "Plaintiffs cannot establish any particular food item from defendant resulted in exposure to Salmonella" is unpersuasive for the following reasons.  First, in their brief, Defendants admit that "[t]here is no requirement to positively identify the item that causes illness . . ." to succeed on a tort claim based on an allegation of food poisoning.  (Def. Mot. for Summ. J., at 1.)  New Jersey law supports this admission.  In McGuinness, a case that is remarkably similar to this dispute, the plaintiffs developed SE after consuming lasagna made from ingredients purchased at the defendant's supermarket.  608 A.2d at 341.  The plaintiffs brought a products liability action and a negligence action against the suppliers of the ingredients and the supermarket where the cook purchased the ingredients.  Id.  The defendants made a motion for

summary judgment, arguing, inter alia, that the plaintiffs failed to present a prima facie case, and that the plaintiffs could not succeed on any viable theory of tort liability.  Id. at 342.  Applying the theory of alternative liability, the court denied the defendant's motion for summary judgment finding that when the cause of an injury is a single act of "wrongdoing (products liability) committed by one of the defendants with the proof not clear as to which defendant, if any, is guilty of the single act . . . the defendants will be required to present evidence of their non-liability."  Id. at 346.

That alternative theory of liability is applicable to the facts of this case.  Like the plaintiffs in McGuinness, who were unable to prove which particular ingredient caused their injuries, here, Plaintiffs lack conclusive evidence that any particular food item they consumed at Harrah's caused their illness.  Plaintiffs offered evidence that they consumed foods at Harrah's during the ordinary incubation period for SE, and that they became sick shortly thereafter.  Plaintiffs also demonstrated that the common food item they consumed two days before their stay at Harrah's is an unlikely source of SE.  Based upon this information, the possibility exists that a particular food item they consumed at Harrah's caused their illness.  Moreover, like the defendants in McGuinness, here, Defendants failed to prove their nonliability.  The only exculpatory evidence Defendants offer is the report prepared by Dr. Acheson.  However, Dr. Acheson's report does not absolve Defendants of responsibility for Plaintiffs' injuries; rather, it merely establishes that material issues of fact remain concerning the cause of Plaintiffs' injuries.  This information alone does not establish that food items Plaintiffs consumed at Harrah's did not cause their illness.  Therefore, at best, Dr. Acheson's findings reinforce the fact that material issues of fact remain concerning whether Defendants are responsible for Plaintiffs' injuries.

14

Second, Defendants fail to cite any binding authority from New Jersey for the proposition that a plaintiff must identify the specific food item that was the cause of his or her injuries. Instead, Defendants cite nonbinding case law from Missouri, California, and Arkansas to argue that Plaintiffs failed to identify the specific food item that caused their illness.  The fact that Defendants provide little New Jersey case law to support their position is significant because New Jersey has a strong policy which favors innocent plaintiffs who cannot recover for their injuries because they are unable to identify the precise cause of their injuries.  McGuinness, 608 A.2d at 450.  Thus, in light of New Jersey's policy, it is unlikely that the New Jersey Supreme Court would find precedent from California, Missouri, or Arkansas persuasive if it would have the effect of denying innocent plaintiffs relief.

The sole case Defendants do cite from New Jersey does not support their argument that Plaintiffs must demonstrate that a particular item they consumed at Defendants' restaurant is the proximate cause of their injuries.  Defendants note that in Koster v. Scotch Assoc., 640 A.2d 1225 (N.J. Super. Ct. Law Div. 1993), the Court cited an opinion from the Court of Civil Appeals of Texas which held that "[i]n order to prevail under the rule of strict liability, each individual restaurant patron . . . [must] prove[] that the injury which he sustained was proximately caused by the unwholesome and unfit condition of the food, beverage, or ice served to him."  Id. at 1230 (citing Herbert v. Loveless, 474 S.W.2d 732, 737 (Tex. Civ. App. 1971)).  Defendants rely upon this pronouncement to argue that Plaintiffs "bear the burden of proving that the cause of their injuries was a product served by defendant."  (Def. Mot. for Summ. J., at 8.)

However, Koster provides strong support for Plaintiffs' position.  In fact, the evidence of causation in Koster was even less compelling than the evidence Plaintiffs offer in this case.  The

15

relevant facts from <u>Koster</u> are as follows:

> All of the plaintiffs suffered food poisoning from salmonella
> enteritidis (hereinafter salmonella) after having dined at the
> defendant's restaurant on five separate days in May 1990.  The
> plaintiffs were all served different foods and <u>there is no direct
> evidence that any particular food was the cause of the food
> poisoning</u>.  There is some indication, however, that the raw eggs in
> the caesar salad <u>may have been</u> the source of salmonella.

640 A.2d at 1226 (emphasis added).  Furthermore, there was evidence in <u>Koster</u> that the food

handling practices at the defendant's restaurant were inadequate.  <u>Koster</u>, 640 A.2d at 1226.

Moreover, although the evidence pointed to the raw eggs in the Caesar salad as the likely source

of SE, a New Jersey Department of Health investigation report revealed that "[t]he leftover raw

eggs were tested and found negative for <u>Salmonella enteritidis</u> . . . ."  <u>Id.</u> at 1225.  On those facts,

the New Jersey court found that there was sufficient evidence to find that the defendant was

strictly liable for the plaintiff's injuries and granted the plaintiff summary judgment.  <u>Id.</u> at 1230.

     The facts of <u>Koster</u> starkly resemble the facts of this case.  Like the plaintiffs in <u>Koster</u>,

who were unable to prove that any particular food item caused their illness, Plaintiffs cannot

prove that the sole source of their injuries was the eggs they consumed at Reflections Café.  In

fact, the record demonstrates only that Plaintiffs consumed eggs at Reflections Café three hours

before their symptoms began, and that eggs are the most common source of SE.  Furthermore,

similar to the health inspection reports in <u>Koster</u>, which revealed that the food handling practices

in the defendant's restaurant were subpar, here, the reports prepared by health inspectors reveal

that the food handling procedures at Reflections Café were deficient.  Finally, in <u>Koster</u>, the court

noted that "[t]he incubation period, the clinical symptoms and the duration of the symptoms

[were] consistent with salmonellosis."  <u>Id.</u> at 1226.  Likewise, here, the incubation period and the

duration of Plaintiffs symptoms strongly suggest that they suffered from food poisoning from Salmonella.  Therefore, in light of factual similarities between <u>Koster</u> and this dispute, <u>Koster</u> strongly supports <u>Plaintiffs'</u> position.

Moreover, Defendants' argument is unpersuasive because the cases they cite from Missouri, California, and Arkansas are distinguishable from the case at bar.  First, Defendants cite <u>Stewart v. Martin</u>, 181 S.W.2d 657 (1944), for the proposition that "[t]he unwholesome character of food is not established, nor is a prima facie case made, merely by showing that the plaintiff became sick after eating it."  <u>Id.</u> at 658.  However, <u>Stewart</u> is distinguishable from this dispute.  In <u>Stewart</u>, the plaintiff became ill after consuming a ham sandwich at the defendant's cafeteria.  <u>Id.</u> at 657.  During the eighteen-hour period leading up to his illness, the plaintiff consumed food or beverage on four different occasions, including the ham sandwich that allegedly caused his stomach illness.  <u>Id.</u> at 658.  The Missouri Supreme Court held that the trial court correctly issued a directed verdict for the defendant because:  (1) the plaintiff offered no medical testimony that eating the ham sandwich caused his illness; (2) the illness he suffered was caused by other products such as soft drinks, milk and milk products – the very items he consumed during the period leading up to his infection; and (3) the plaintiff testified that the ham he consumed appeared to be fit for consumption.  <u>Id.</u>

Contrary to the plaintiff in <u>Stewart</u>, who alleged that the source of his illness was a single ham sandwich he consumed at the defendant's cafeteria, here, Plaintiffs claim that a food item they consumed at Harrah's during a two-day period caused their sickness.  Hence, this Court's inquiry is not limited to the possibility that one specific item Plaintiffs consumed at Harrah's caused their illness, rather the inquiry is whether <u>any</u> food item they consumed at Harrah's caused

17

their SE.  This case is also distinguishable from <u>Stewart</u> because, in <u>Stewart</u>, the plaintiff's own physician did not conclude that the cause of the plaintiff's illness was food poisoning.  Instead, the plaintiff's physician merely stated that he "thought" the plaintiff's condition was food poisoning.  Here, two medical experts agreed that Plaintiffs suffered from a severe case of SE and that the cause of the SE was the eggs Plaintiffs consumed at Reflections Café.  Therefore, the Court's holding in <u>Stewart</u> does not resolve the current dispute.

Defendants also site <u>Minder v. Cielito Restaurant</u>, 67 Cal. App. 3d 1003 (Cal. Dist. Ct. App. 1977), for the proposition that "[t]he unwholesome character of food is not established, nor is a prima facie case made, merely by showing that the plaintiff became sick after eating it."  <u>Id.</u> at 1007 (citations omitted) (citing <u>Stewart</u>, 181 S.W.2d at 658).  In <u>Minder</u>, the plaintiffs, husband and wife, became ill after dining at a restaurant.  <u>Id.</u> at 1006.  The plaintiffs sued the defendant restaurant, arguing that the food they consumed at the restaurant caused their injuries.  The only evidence the plaintiffs offered to support their theory of causation was an expert report which stated that the illness for which they were diagnosed (Shingella Flexneri) was caused by the food they consumed at the defendant's restaurant.  <u>Id.</u> at 1006-07.  However, the plaintiff's own doctor admitted during cross examination that [Shingella Flexneri] could be transmitted by contact with toilets or "any other object that may be touched by hand."  <u>Id.</u> at 1007.  Furthermore, the doctor stated during cross examination that (1) if the plaintiffs had eaten at another location the night before they became infected with Shingella Flexneri, "it would be just as logical that they could have taken contaminated food at either place," and that (2) he was unable to determine whether both plaintiffs were infected simultaneously.  <u>Id.</u>  The only other evidence that the plaintiffs offered were reports from the Health Department that conditions at the restaurant were unsanitary.

18

Id. at 1007.  Finding that the only evidence the plaintiffs produced to support their theory of causation was testimony by one physician that food they consumed at the defendant's establishment caused their illness and the testimony of two health inspectors that the defendant's establishment was filthy, the court held that the plaintiffs failed to prove that the cause of their sickness was food poisoning.  Id. at 1010.

Unlike the plaintiffs in Minder, who offered inconclusive testimony from a physician that the food they consumed at the defendant's restaurant could have caused their illness, and testimony from two health inspectors that the defendant's restaurant was unsanitary, here, Plaintiffs offered evidence from three experts that the food items they consumed at Reflections Café caused their SE.  Moreover, contrary to the expert in Minder, who stated that it was just as likely that the cause of the plaintiffs' symptoms was food they consumed the evening before they dined at the defendant's restaurant, two of Plaintiffs' experts expressly ruled out the possibility that pizza Plaintiffs' consumed the two days before their stay at Harrah's caused their illness. Moreover, unlike the experts in Minder, who testified that the conditions at the defendant's restaurant were unsanitary, Plaintiffs' expert, Professor Pomianoski, went beyond reporting that the conditions at Reflections Café were generally filthy – he specifically noted that the filthy conditions caused Plaintiffs' illness.  In his expert report, Professor Pomianoski stated that the filthy conditions at Reflections Café "[were] a substantial factor in causing the cases of salmonella suffered by [Plaintiffs]."  (Pl.'s Response to Mot. of Def.'s for Summ. J. Ex. E, at 9.)  Therefore, Minder is distinguishable from this dispute.

Finally, Defendants rely upon the Arkansas Supreme Court's pronouncement in Franke's Inc., v. Bennett, 146 S.W.2d 163 (Ark. 1941), that "the mere fact that a person eats food in a

restaurant, hotel or cafeteria and thereafter becomes ill, is of itself insufficient to establish liability

on the owner, but the proof must go further and show that some particular article of the food

consumed was in fact unwholesome and unfit for human consumption." Id. at 164.  In Bennett,

the plaintiff became violently ill after consuming sea scallops at the defendant's restaurant.  Id.

During trial, the evidence demonstrated that "the scallops were purchased from a Boston dealer of

excellent reputation and were shipped in a sealed can in ice[,] . . . immediately placed in

refrigeration at [the appropriate temperature], . . . removed from the refrigerator[,] . . . and

prepared for consumption under proper sanitary conditions." Id.  The evidence also demonstrated

that the shipment contained thirty-six servings and none of the other thirty-five patrons who

consumed the scallops were infected.  Id.  The court upheld a jury verdict favoring the defendant

on the grounds that the undisputed evidence showed that every possible precaution was taken to

ensure that the food was fit for consumption, and that the plaintiff did not present sufficient

evidence that the sea scallops were contaminated.  Id.

　　　　In contrast to the defendant in Bennett, who provided evidence that it complied with all

relevant safety requirements, here, there is no evidence that Defendants acted with ordinary care

by appropriately transporting, storing, and serving food.  In fact, the record is replete with

evidence that Defendants failed to meet the duty of care in the storage and maintenance of food

items.  Professor Pomianoski stated that "[t]he foods served to [Plaintiffs] 'were served to them in

a deleterious [harmful] condition,' based on the continuing pattern of food service sanitation

violations within the Reflections Café environment," and concluded that "[Defendants'] breach of

warranty was a substantial factor in causing the cases of salmonella suffered by [Plaintiffs]."

(Pl.'s Response to the Mot. of Def.'s for Summ. J.  Ex. E, at 8.)  Therefore, because Bennett is not

binding precedent in this jurisdiction, and the evidence in the record demonstrates that Defendants failed to meet their duty of care in transporting and serving food, the court's holding in Bennett does not determine the outcome of this dispute.

In sum, Defendants offer no evidence that the New Jersey Supreme Court would require Plaintiffs to identify a particular item that caused their illness or demonstrate that the specific food item they consumed was infected. Therefore, given the strong policy in New Jersey favoring innocent plaintiffs in tort cases, it is unlikely that the New Jersey Supreme Court would grant Defendants summary judgment simply because Plaintiffs cannot identify a particular food item that caused their illness.

Defendants' argument that the food items Plaintiffs' claim caused their illness falls outside of the ordinary incubation period for SE also fails because Plaintiffs' experts acknowledged that the ordinary incubation period for SE depends upon the amount of SE consumed. At most, the record demonstrates that a material issue of fact exists concerning whether the incubation period for SE can be three hours. In their brief, Defendants argue that Plaintiffs' experts provided a range of incubation periods for Salmonella, and that none of the potential incubation periods were shorter than six hours. In contrast, Plaintiffs offered expert testimony by Dr. Ellner that "the incubation period may relate to the size of the inoculum. High inocula are associated with shorter incubation periods and more severe disease." (Pl.'s Response to the Mot. of Def.'s for Summ. J. Ex. B, at 2.) Furthermore, Dr. Ellner observed that "[g]iven the severe nature of the colitis and the fact that [Plaintiffs] were infected after a single food exposure, the exposure was likely to be intense and the incubation period short." (Id.) Although Defendants' expert, Dr. Acheson, stated that [t]he incubation period for salmonella . . . is . . . between 6 hours and 10 days, with the usual

incubation period of between 6 hours and 48 hours," he did not argue that the incubation <u>cannot be</u> three hours.  Instead, he noted that data from the Centers for Disease Control and Prevention reveals that the normal incubation period for SE is between six and forty-eight hours.  (Def.'s Mot. for Summ. J. Ex. E, at 2.) (citation omitted).  Therefore, a triable issue of fact exists concerning whether the incubation period for salmonella may be three hours.

Defendants argument that Plaintiffs cannot eliminate the possibility that food sources from outside of Defendants' control caused Plaintiffs' injuries fails as a matter of law.  First, Defendants offer little support from New Jersey that Plaintiffs must eliminate every possible cause of SE in order to survive a motion for summary judgment.[3]  In fact, the only New Jersey precedent that Defendants cite is distinguishable from this dispute.  In <u>Carroll v. Friendly Ice Cream Corp.</u>, No. A5499-97T5, 1999 WL 399908 (N.J. Super. App. Div. Apr. 13, 1999), the plaintiff consumed a meal at a local restaurant, which consisted of a grilled chicken breast sandwich with mayonnaise, cream of broccoli soup, french fries, and a glass of water.  <u>Id.</u> at *1.  The plaintiff became ill approximately two hours after consuming the meal.  When the plaintiff went to her doctor to determine the cause of her illness, the doctor's laboratory test specifically ruled out the possibility that she suffered from salmonella or any other food poisoning.  The court held that the

---

[3] Defendants offer <u>Etienne v. United Corp.</u>, No. 205/1999, 2001 WL 1568598 (Terr. V.I. Oct. 15, 2001) to support their position.  Because this case is not binding precedent in this jurisdiction, it does not determine the outcome of this dispute.  More importantly, <u>Etienne</u> is easily distinguishable from this dispute because the plaintiff in <u>Etienne</u> had no expert testimony to support her assertion that the cause of her illness was SE.  The court found that the sole expert the plaintiff relied upon was unqualified to make an assessment of the plaintiff's condition.  <u>Etienne</u>, 2001 WL 1568598, at *5.  Furthermore, the court held that the procedures employed by the expert were unreliable.  <u>Id.</u> at *6.  Finally, although the court acknowledged that "a plaintiff's expert is not required to rule out all alternative possible causes [of a plaintiff's] injury]," the court found that the report presented by the plaintiff's expert was unreliable because he "fail[ed] to rule out any other alternative possible causes," of SE.  <u>Id.</u> at 6.  Here, Plaintiff has offered testimony from three experts who specialize in the field of infectious diseases, and Defendants do not challenge the sufficiency or reliability of their reports.

plaintiff failed to make a prima facie case of food poisoning.  Id. at *2.  Carroll is distinguishable from this case because unlike the plaintiff in Carroll, who provided laboratory tests specifically excluded the possibility that she suffered from food poisoning, here, Plaintiffs offered a report that clearly demonstrates that the cause of their illness was SE.  Therefore, Defendants' reliance upon Carroll is misplaced.

Second, there is support in New Jersey case law for the proposition that a plaintiff need not eliminate all possible causes of the plaintiff's injury in order to survive a motion for summary judgment.  As the New Jersey Supreme Court held in Creanga, "[a]n expert need not conduct every possible test to rule out all possible causes of a patient's [injury], so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion."[4]  886 A.2d at 639 (internal quotation marks omitted); Heller v. Shaw Indus., Inc., 167 F.3d 146, 156 (3d Cir. 1999).  Therefore, because Defendants' fail to provide support from New Jersey law for the argument that a plaintiff must eliminate all other potential causes of harm to survive a motion for summary judgment, Defendants' argument fails as a matter of law.

---

[4] Although the issue presented to the court in Creanga was whether an expert report based on differential diagnosis is admissible evidence under New Jersey Rule of Evidence 702, the Court's holding applies equally here.  In Creanga, the New Jersey Supreme Court defined "differential diagnosis" as "a medical construct for determining which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their symptoms."  886 A.2d at 639.  A differential diagnosis consists of two discrete steps.  First, the expert must "'rule in' all plausible causes for the patient's condition by compiling 'a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration."  Id. at 356.  Second, "after the expert rules in plausible causes, the expert then must rule out those causes that did not produce the patient's condition by engaging in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case."  Id. (internal quotation marks omitted).  Differential diagnosis is an accepted methodology in both the New Jersey Supreme Court and the Third Circuit Court of Appeals.  Id. at 640; see In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 758 (3d Cir. 1991).  The Court's analysis in Creanga applies here because the plaintiff sought to use the expert's opinion in order to establish causation.  The Court concluded that it is unnecessary for an expert to eliminate all other potential causes of harm in order to reach a conclusion that the defendant's actions caused harm to the plaintiff.  This is precisely the issue that Plaintiffs' experts seek to prove here:  that Defendant's actions caused harm to Plaintiff.

Moreover, Defendants' contention that "plaintiffs' expert opinions regarding the timeline are too inaccurate to provide the basis for causation," is unavailing because Plaintiffs' experts did not rely solely on the temporal relationship between the time when Plaintiffs' consumed eggs at Reflections Café and the onset of their symptoms to prove causation.  In their brief, Defendants cite authority from this Circuit, the Sixth Circuit, the District of Colorado and the Southern District of Ohio for the proposition that "a differential diagnosis that rests solely or primarily upon timing . . . is an inadmissible net opinion."[5]  (Mem. of Law in Supp. of Def.'s Mot. For Summ. J.)  Although Defendants correctly note that expert opinions regarding the timeline of infection are often inadequate, standing alone, to establish causation, if the temporal relationship between a causal event and injury is particularly strong, the court may rely heavily upon expert testimony.  As the Third Circuit stated in Heller, "a number of courts, including [this Circuit] have looked favorably on medical testimony that relies heavily on a temporal relationship between an illness and a causal event."  167 F.3d at 154.  Here, the temporal relationship between the alleged harm and the injury is quite strong as Plaintiffs experienced symptoms of SE merely three hours after consuming the allegedly contaminated eggs.  Furthermore, Plaintiffs' experts relied upon other important factors to establish causation, including, but not limited to (1) medical studies which demonstrate that eggs are the most common cause of SE; (2) an examination of the other foods that Plaintiffs consumed during the period leading up to the onset of Plaintiffs' symptoms; and (3) the filthy, unsanitary conditions at Reflections Café.  Therefore, Defendants' claim that Plaintiffs' expert's opinion is mere "net opinion" fails.

---

[5] According to the Supreme Court of New Jersey, a "net opinion" is "an opinion based on bare conclusions untethered to facts."  Creanga, 886 A.2d 633.

In sum, taking all reasonable inferences in favor of Plaintiff, summary judgment is inappropriate because material issues of fact remain concerning whether the food Plaintiffs consumed at Harrah's caused their SE.  Plaintiffs met their burden by providing evidence in the form of expert reports upon which a reasonable jury could conclude that the cause of their illness was food they consumed at Harrah's.  Therefore, Defendants' motion for summary judgment is denied.

IV.     **CONCLUSION**

For the foregoing reasons, this Court will deny Defendants' motion for summary judgment.  An appropriate Order shall follow.

Date: 10-21-2010          /s/ Robert B. Kugler
                          ROBERT B. KUGLER
                          United States District Judge